UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM GULDI,

                Plaintiff,

v.

GENERAL MOTORS, LLC,

                Defendant.
_____/

Civil Action No. 22-11488

Jonathan J.C. Grey
United States District Judge

David R. Grand
United States Magistrate Judge

## REPORT AND RECOMMENDATION TO GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 44)

Plaintiff William Guldi ("Guldi") commenced this civil action on June 30, 2022, against his current employer, defendant General Motors, LLC ("GM"), alleging violations of his rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112 et seq., and Michigan's Persons with Disabilities Civil Rights Act ("PWDCRA"), M.C.L. § 37.1101 et seq. After discovery closed, GM filed a motion for summary judgment, arguing that Guldi's claims fail both procedurally and substantively. (ECF No. 44). Specifically, GM first argues that Guldi's ADA claim fails because he did not timely file an EEOC charge, and that his PWDCRA claim fails because he did not timely file this action. GM also argues that Guldi fails in various respects to make out a *prima facie* case under either the ADA or the PWDCRA. The motion was fully briefed (ECF Nos. 48, 51, 57, 58), and the Court held oral argument on April 23, 2024. The Court gave the parties ample time to attempt to resolve the case, but they were unable to do so.

For the reasons explained below, GM's motion should be granted.

## I.    Background

Guldi began working at GM in July 2006, first as a production worker, and then, starting in December 2009, as a driver in GM's Company Vehicle Operations ("CVO"). The CVO driving pool consists of a lead driver, and crew members who deliver, inspect, and clean vehicles at the instruction of the lead driver.  In instances where CVO members delivered multiple cars but returned in only one car together, the lead driver would drive the group back.  (ECF 44-2, PageID.455).  Guldi admits that the lead driver would "drive continuously all day."  (*Id.*).

Guldi was diagnosed with Carpal Tunnel Syndrome in 2016, which affected his hands, wrists, and elbows.  Around that time, Guldi's doctor began prescribing him medical restrictions, specifically, "one hour driving, one hour recoup."  (ECF No. 44-4).

"For approximately three years, from 2016 through March 25, 2019, Guldi's restrictions were honored" by GM, with Guldi being "removed from [his] lead driver [position] and given driver responsibilities consistent with his work restrictions . . ."  (ECF No. 1, PageID.3; ECF No. 48, PageID.866).  But here, "consistent with his work restrictions" meant that Guldi would merely ride back in a van with multiple other CVO drivers who had driven outbound cars, including the "lead driver," who would drive the van back; indeed, due to his restrictions, Guldi admits he could not serve in the "lead driver" role.  (ECF No. 44-2, PageID.462; ECF No. 48-4, PageID.1154-55).

Guldi's doctor continued to prescribe the same restrictions every three months, though they had briefly lapsed in 2019.  (ECF No. 52-3).  Guldi alleges that GM then "abruptly terminated Guldi's assignment, and thereby his employment, on March 25, 2019,

alleging an 'undue hardship' to accommodate Guldi's acknowledged disability, said hardship allegedly caused by a change of business operations affecting CVO drivers and their assignments." (ECF No. 1, PageID.3). GM presented evidence that when Guldi's restrictions lapsed and were then reinstated by his doctor, GM People Human Resources/Labor Relations employee Mohammed Hammoud ("Hammoud") reviewed Guldi's restrictions. (ECF No. 44-12, PageID.538, 541, 543-45). Hammoud met with Michael Bailey ("Bailey"), GM's CVO Service Manager, who advised that due to a greater number of vehicles that were moving to the "Tech Center" from further away, GM's drivers needed to be available to drive longer drives throughout the day. (*Id.*, PageID.549; ECF No. 44-13, PageID.585-87, 596-97; ECF No. 44-19, PageID.721, 724). GM performed a study to determine whether it should continue using CVO drivers to move vehicles or, alternatively, ship vehicles on trucks, and the study showed that it was more cost effective to use drivers. (ECF No. 44-19, PageID.724; ECF No. 44-16, PageID.660-62). GM thus determined to use drivers rather than trucks. (*Id.*). The increased volumes involved more "one for ones," meaning that CVO drivers who drove a car to the Tech Center would return in a different car, rather than riding back as a group in a van. (ECF No. 44-13, PageID.587, 596; ECF No. 44-16, PageID.667, 669). Given the length of the drives, Guldi was unable to do these return drives without first resting for an hour, which essentially meant that his restrictions prevented him from not only serving as a lead driver, but from working more than half a day when the drives were "one for ones." (ECF No. 44-2, PageID.462, 492).

Thus, starting in March 2019, Guldi was "furloughed" and began receiving both short term and long term disability benefits. (ECF No. 44-14, PageID.628; ECF No. 48,

PageID.866; ECF No. 44-2, PageID.438, 481-83).[1]  Guldi filed a grievance with his union, and attempts were made to find him work that did not involve driving an amount of hours in excess of what Guldi's restrictions would allow, but those efforts were unsuccessful. (ECF No. 44-6; ECF No. 44-2, PageID.484; ECF No. 44-20; ECF No. 44-12, PageID.558-59).  From late March 2019 forward, Guldi submitted his quarterly restrictions to GM for review. (ECF No. 52-3).  After each such review, GM completed a new Duty Disposition Letter ("DDL"), which is a record prepared by a "medical practitioner" within GM's Plant Medical Services that indicates to management and Human Resources an employee's status with respect to his medical restrictions.  (ECF No. 44-12, PageID 548; ECF No. 51-4).

One of the main issues raised by GM in its summary judgment motion is the timeliness of Guldi's claims, and Guldi's approach to that issue centers largely on the contents of the DDLs, so the Court will discuss them in detail here.  The first DDL was prepared on March 27, 2019, by Meaghan Shea, RN.  (ECF No. 51-4, PageID.1491).  One section of the DDL is titled "Restrictions," and clearly specifies Guldi's restrictions under the "Notes" heading, as well as the restrictions' "Start Date" and "Date Lifted," *i.e.*, the date upon which Guldi's restrictions – at least without being extended by his doctor – would terminate and no longer limit his ability to perform his work:

Restrictions

| Restriction | Start Date | Date Lifted | Permanent | Notes | Case No |
|---|---|---|---|---|---|
| Job Accommodation | 03/08/2019 | 08/14/2019 | False | JOB ACCOMMODATION: "MAY DRIVE ONE HOUR CONTINOUSLY THEN EMPLOYEE TO REST FROM DRIVING FOR ONE HOUR" X 3 MONTHS. End Date: 08/14/2019 | 2018-15020246 |

---

[1] In addition, Guldi applied for Social Security Disability benefits, and in the process admitted that he "became unable to work because of [his] conditions on March 21, 2019."  (ECF No. 44-2, PageID.446, 481-82).  Guldi's application was granted, and he was awarded $42,767.00 in Social Security disability benefits. (*Id.*).

(*Id.*).  Thus, in the DDL, GM recognized that Guldi had the restriction of "may drive one hour continuously then [he must] rest from driving for one hour" (the "Restrictions") and that the Restrictions would last for "3 months," with an "end date" of June 14, 2019.  (*Id.*). The DDL lists Guldi's "Duty Disposition" as "Unable to Return to Work," and his "Absent/Restricted Status" is listed as "(US) Disability-NJAWR."[2]  (*Id.*).  At the bottom of the DDL is a section titled "Note to Supervisor," which, in this first DDL, is blank.  (*Id.*).

Each successive DDL contains the Restrictions' applicable new "Start Date" and "Date Lifted," always approximately 90 days apart.  (ECF No. 51-4).  Similarly, each DDL's "Absent/Restricted Status" for the period in question is reported as "(US) Disability-NJAWR."  (*Id.*).  Under the Notes heading, the DDLs sometimes refer to an "End Date" for the Restrictions, and sometimes to a "Lift Date," but in each instance, that date is identical to the one specified under the "Date Lifted" heading.  For example, one DDL form, also completed by RN Shea, covers two separate 90-day periods – from September 14, 2019 to December 16, 2019, and from December 16, 2019 to March 6, 2020, with the first referencing an "end date" and the second referencing a "lift date":

**Restrictions**

| Restriction | Start Date | Date Lifted | Permanent | Notes | Case No |
|---|---|---|---|---|---|
| Job Accommodation | 09/14/2019 | 12/16/2019 | False | Seniority Date: 10/15/2007 Case #: 2007023027 Start Date: 09/14/19 JOB ACCOMMODATION: "MAY DRIVE ONE HOUR CONTINUOUSLY THEN EMPLOYEE TO REST FROM DRIVING FOR ONE HOUR" X 3 MONTHS End Date: 12/16/19 | 2007023027 |
| Job Accommodation | 12/16/2019 | 03/06/2020 | False | Seniority Date: 10/15/2007 Case #: 2007023027 Start Date: 12/16/19 JOB ACCOMMODATION: "MAY DRIVE ONE HOUR CONTINUOUSLY THEN EMPLOYEE TO REST FROM DRIVING FOR ONE HOUR" X 3 MONTHS lift Date: 03/06/2020 | 2007023027 |

---

[2] Guldi admits that "NJAWR" means "no job available with restrictions."  (ECF No. 48, PageID.866; ECF No. 59, PageID.1562).

5

(ECF No. 51-4, PageID.1493).

As discussed below, Guldi's summary judgment briefing makes clear that the heart of his case is based on the information contained in the "Note to Supervisor" section of September 2020 DDL.  To understand the issue, it is helpful to compare the "Note to Supervisor" verbiage from the various DDLs:

| Date Range | Medical Practitioner | "Note to Supervisor" Verbiage |
|---|---|---|
| 3/8/19-6/14/19 | RN Shea | Blank |
| 6/14/19-9/13/19 | Norkita Thompson | "[Guldi] to be on restriction from 6/14/19 until 9/13/19." |
| 9/14/19-12/16/19/ 12/16/19-3/8/20 | RN Shea | "NJAWR" |
| 3/6/20-6/12/20 | RN Shea | "NJAWR.  Lifted 6/12/2020" |
| 6/15/20-9/15/20 | Aimee McCollum, RN | "NJAWR" |
| 6/15/20-9/15/20/ 9/15/20-12/15/20 | RN Shea | "NJAWR through 12/14/2020" |
| 9/15/20-12/15/20/ 12/14/20-3/16/21 | Jessica Kong | "NJAWR.  Full duty 03/16/2021."[3] |
| 12/14/20-6/15/21 | April Braxton | "NJAWR" |
| 12/14/20-9/15/21 | Barbara Yakes | "NJAWR 6-14-2021 through 9-14-2021." |

(ECF No. 51-4).

Returning to the timeline of events, on April 20, 2021, after being on paid leave for more than two years, Guldi filed a Charge of Discrimination with the EEOC (the "EEOC

---

[3] Guldi's arguments are based largely on the information in this particular DDL, which the Court will refer to as the "Kong DDL."

Charge"), alleging that GM failed to accommodate his disability.  (ECF No. 44-11).  But the claim in Guldi's EEOC Charge is quite different than the allegations in his instant complaint.  Whereas Guldi alleges in his complaint that GM failed to "accommodate [his] acknowledged disability" and "illegal disability discrimination against [him]" when it "***abruptly terminated*** Guldi's assignment, and thereby his employment, ***on March 25, 2019***," and "has engaged in the ***continuing practice*** of discrimination against Guldi based on his disability throughout this period of unemployment, i.e., ***March 25, 2019 through his return to work on September 15, 2021*** [] each constituting separate acts of discrimination in a pattern of discrimination," (ECF No. 1, PageID.3-4) (emphasis added), in his EEOC Charge, Guldi pinpoints ***March 16, 2021*** – the last day to which the Kong DDL applied – as the ***start*** of GM's unlawful discrimination:

> [GM] had been honoring my work restrictions since 2016.  On March 16, 2021 I was informed that if my restrictions were not lifted I could not return to work.[4]  I believe [GM] [therefore] failed to reasonably accommodate my disability.

(ECF No. 44-11).

On July 28, 2021, Guldi attended an independent medical examination and was cleared to return to work without restrictions, and Guldi returned to work on September 15, 2021.  (ECF No. 44-2, PageID.445; ECF No. 44-12, PageID.571).  The EEOC later issued Guldi a Right to Sue letter, and he commenced this action on June 30, 2022, within

---

[4] Here, Guldi is referring to the Kong DDL's "Note to Supervisor" reference to "full duty," which he also characterizes as GM's "100% healed rule."  (ECF No. 57, PageID.1534).  Importantly, Guldi has clarified that "the application and enforcement of the 100% healed rule is ***the complained of discriminatory act*** which did not arise until December 2020."  (*Id.*) (emphasis added).

90 days of that letter's issuance.[5]  (ECF No. 1, PageID.2).  After discovery closed, GM moved for summary judgment, arguing both that Guldi's claims are time barred and that they fail on the merits.

## II.    LEGAL STANDARDS

Pursuant to Federal Rule of Civil Procedure 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011).  A fact is material if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party.  *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'"  *Wrench LLC v. Taco Bell Corp.,*

---

[5] The Right to Sue letter does not appear to be in the record, but GM does not dispute that Guldi commenced this action within 90 days of its issuance.

256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).   In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (internal quotations omitted).

## III.    ANALYSIS

GM's first argument in support of its motion for summary judgment is that Guldi's claims fail because he did not timely pursue them.  (ECF No. 44).  Specifically, GM argues that (1) Guldi failed to file his EEOC charge within 300 days of GM's initial decision on March 25, 2019, that it did not have work available that would accommodate Guldi's restrictions; and (2) Guldi failed to file his PWDCRA claim within three years of that same date.  (*Id.*).   While GM also presents various arguments on the merits of Guldi's claims, careful review of Guldi's summary judgment briefs and the relevant case law shows that Guldi strained too hard to respond to GM's statute of limitations arguments, and doomed his claims in the process.

"To establish a prima facie case of failure to accommodate under the ADA or PWDCRA, an employee must show: (1) he is disabled within the meaning of the ADA [or PWDCRA]; (2) he is otherwise *qualified* for his position, ... with or without accommodation; (3) the employer knew or had reason to know of his disability; (4) the employee requested an accommodation; and (5) the employer failed to provide a reasonable accommodation thereafter." *Greiner v. Charter Cnty. of Macomb, Michigan*,

No. 14-cv-13979, 2017 WL 3977845, at *8 (E.D. Mich. Sept. 11, 2017), aff'd sub nom. *Greiner v. Macomb Cnty., MI*, No. 17-2417, 2019 WL 8884615 (6th Cir. Aug. 16, 2019). ADA and PWDCRA claims also have specific statutes of limitations and procedural requirements.  For example, before a plaintiff can assert a claim under the ADA in federal court, he must properly exhaust his administrative remedies, which means he "must file a charge of discrimination with the EEOC within 300 days of the alleged discrimination." *Jones v. Nat. Essentials, Inc.*, 740 F. App'x 489, 492-93 (6th Cir. 2018).  *See* 42 U.S.C. §§ 12117(a), 2000e-5(e)(1).  A plaintiff asserting a PWDCRA claim must file suit within three years from the alleged unlawful discrimination.  *See Bruneau v. Aquinas Coll.*, No. 1:19-CV-1037, 2021 WL 4975755, at *5 (W.D. Mich. Oct. 5, 2021); *Garg v. Macomb County Cmty. Mental Health Servs.*, 472 Mich. 263, 283 (2005); M.C.L. § 600.5805.

In its summary judgment motion, GM argues that Guldi failed to timely pursue both his ADA and PWDCRA claims.  The Court will begin by addressing Guldi's ADA claim.

### *ADA Claim*

As to Guldi's ADA claim, GM argues:

> Plaintiff filed his EEOC Charge on April 20, 2021.  Plaintiff incorrectly stated in his EEOC Charge that he was denied an accommodation on March 16, 2021.  His Complaint, deposition testimony and his own handwritten notes show that he was actually "denied" an accommodation, and his claim accrued, two years before, in March 2019 when he was first placed on leave.

(ECF No. 44, PageID.416).

As the Honorable Denise Page Hood explained in *Taylor v. AutoAlliance Intern, Inc.*, 2009 WL 2591533, at *4 (E.D. Mich. Aug. 24, 2009), "[d]etermining the timeliness

of Plaintiff's EEOC complaint, and this ensuing lawsuit, requires this Court to identify precisely the unlawful employment practice of which she complains." Guldi greatly complicated that task here by wavering on his arguments. On the one hand, Guldi's complaint suggests he is asserting a straightforward discrimination claim based on GM's denials of his accommodation requests, as he alleges that starting on "March 25, 2019 through his return to work on September 15, 2021," his quarterly requests for accommodation were denied based on a "pretext" of undue hardship by GM, which constituted a "continuing practice of discrimination . . . [with] each [denial] constituting separate acts of discrimination . . ." (ECF No. 1, ¶¶ 10-13).

But, when GM filed its summary judgment motion and cited *Taylor* for its statement that "[w]here the employee claims that the employer refused to accommodate a disability, the 300–day limitations period runs from the date of the employer's ***initial denial*** for a request for accommodation," *Taylor*, 2009 WL 2591533, at *4 (emphasis added), Guldi appears to have realized that his "continuing practice" argument lacks merit. Indeed, the United States Supreme Court "has previously held that the continuing violations doctrine does not apply to discrete, serial violations," such as the denial of his requests for accommodations. *Maxwell v. Postmaster Gen. of U.S.*, 986 F. Supp. 2d 881, 884 (E.D. Mich. 2013) (citing *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 114 (2002). In fact, in *National R.R. Passenger Corp.*, 536 U.S. at 112, the Supreme Court explained, "discrete acts that fall within the statutory time period do not make timely acts that fall outside the time period." *See also Taylor v. Donahoe*, 452 F. App'x 614, 619 (6th Cir. 2011) ("When an employee alleges discrete acts of discrimination or retaliation, the

continuing violation doctrine may not be invoked to allow recovery for acts occurring outside the filing period. [] . . . Discrete acts that fall within the statutory period do not make those that fall outside the period timely."). Accordingly, to the extent GM's denials of Guldi's accommodation requests pre-date the filing of his EEOC charge by more than 300 days, his ADA claim based on those denials is time-barred.

Apparently recognizing this, rather than the straightforward discrimination claim based on GM's denials of his accommodation requests suggested in his complaint, Guldi now purports to assert a more nuanced ADA claim that is based on the December 2020 Kong DDL's reference to "Full duty." Guldi now seems to be arguing that his ADA claim *arose in March 2019*, but that he was "unaware" of it until he saw the December 15, 2020 Kong DDL's reference to "Full duty," which Guldi interprets as advising him that he "could *only* return to work without restrictions, i.e., 'Full Duty.'" (ECF No. 59, PageID.1562-63) (emphasis in original). Specifically, in his summary judgment response brief, Guldi argues, "[f]rom March 25, 2019 until shortly after December 15, 2020, [he] was unaware that the requirement of removing his restrictions was a prerequisite to obtaining employment . . ." (ECF No. 48, PageID.870). Thus, Guldi now appears to be arguing that in light of the Kong DDL's purported "100% healed rule," his ADA claim dates back to March 25, 2019, and that he timely pursued that claim when he filed his EEOC Charge within 300 days of the December 15, 2020 Kong DDL's issuance. On the other hand, in his most recent brief, Guldi hedges somewhat and asserts that his claims not only accrued with the Kong DDL's issuance, but *began* with it, as he asserts, that "the application and enforcement of *the 100% healed rule is the complained of discriminatory*

*act* which ***did not arise until December 2020***." (ECF No. 57, PageID.1534) (emphasis added). Either way, Guldi's arguments lack merit, as Guldi doomed his claim by tying it to the purported "100% healed rule."

First, even assuming that Guldi's interpretation of the Kong DDL – that he could only return to work if he had no restrictions whatsoever – is reasonable, he presents no evidence that GM held or espoused that position at any time *before* the Kong DDL was issued on December 15, 2020. Thus, to the extent Guldi seeks to assert an ADA claim based on a purported "100% healed rule," such claim would only exist for the period between December 15, 2020, when the Kong DDL was issued, and September 15, 2021, when Guldi returned to work. Accordingly, at a minimum, GM is entitled to summary judgment on any ADA claim by Guldi related to the denials of his accommodation requests prior to the Kong DDL's issuance. *National R.R. Passenger*, 536 U.S. at 112*; Taylor*, 452 F. App'x at 619.

But, even for the later and more narrow period of time between the Kong DDL's issuance and Guldi's return to work, Guldi's ADA claim fails.[6] Although Guldi, as the

---

[6] Because Guldi's theory about a "100% healed rule" – which he now admits is "the complained of discriminatory act" on which his claims rest – fails on the merits, the Court need not resolve the statute of limitations question as it applies to the Kong DDL. However, the Court notes that, contrary to what both parties appear to have accepted, overwhelming case law supports the proposition that each new accommodation denial, even of a renewed accommodation request, starts a new statute of limitations period. This line of cases emanates from the Supreme Court's holding in *Nat'l R.R. Passenger Corp.* that "each discrete act [of discrimination] starts a new clock for filing charges alleging that act . . . The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts ***so long as the acts are independently discriminatory*** and charges addressing those acts are themselves timely filed." *Nat'l R.R. Passenger Corp.*, 536 U.S. at 102 (emphasis added). *See also id.*, at 113 ("[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act."). Indeed, the Court's exhaustive research shows that the great weight of authority on the

---

issue subscribes to this principle, with the real question being whether the employee's request is a request to "reconsider" a prior denial or a renewed request for the same accommodation that the employer considers. *See e.g., Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 130-31 (1st Cir. 2009) ("[A]n employee who renews his request for particular accommodations may bring suit based on a new 'discrete act' of discrimination if the employer again denies his request."); *Hill v. Hampstead Lester Morton Ct. Partners LP*, 581 F. App'x 178, 181 (4th Cir. 2014) ("a plaintiff who renews a request for a previously denied accommodation 'may bring suit based on a new 'discrete act' of discrimination if the [defendant] again denies [the] request,' *Tobin[,* 553 F.3d at 131], and the subsequent denial carries its own, independent limitations period, *Cherosky v. Henderson,* 330 F.3d 1243, 1248 (9th Cir. 2003) (explaining that if a plaintiff's 'new [accommodation] request results in a denial, the time period begins to run anew')."); *Arthur v. D.C. Hous. Auth.*, No. 18-CV-2037 (DLF) 2020 WL 7059552, at *3–4 (D.D.C. Dec. 2, 2020); *Gatling v. Jubilee Hous., Inc.*, No. CV 20-3770 (FYP), 2021 WL 5331707, at *3–4 (D.D.C. Nov. 16, 2021); *Owens-Hart v. Howard Univ.*, 220 F. Supp. 3d 81, 93 (D.D.C. 2016) ("A new request for the same accommodation will restart the statute of limitations clock, but a mere request for reconsideration of a prior denial will not."); *O'Dell v. Kelly Servs., Inc.*, No. 15-cv-13511, 2018 WL 646845, at *5 (E.D. Mich. Jan. 31, 2018); *Bauwin v. SDH Servs. E. LLC*, No. 220CV04211RMGMHC, 2022 WL 6267319, at *17–18 (D.S.C. July 29, 2022), *report and recommendation adopted*, No. CV 2:20-4211-RMG, 2022 WL 4494286 (D.S.C. Sept. 28, 2022); *Crotty v. Windjammer Vill. of Little River, S.C., Prop. Owners' Ass'n, Inc.*, No. 4:15-CV-4042-RBH-TER, 2018 WL 4999786, at *5 (D.S.C. July 31, 2018), *report and recommendation adopted as modified sub nom. Crotty v. Windjammer Vill. of Little River, S.C.*, No. 4:15-CV-04042-RBH, 2018 WL 4560746 (D.S.C. Sept. 24, 2018).

Respectfully, the principal case on which GM relies for the proposition that *only* the "initial" accommodation denial starts the statute of limitations clock, *Taylor*, appears to have relied on cases in which the more recent alleged wrongful act was not "independently discriminatory." For example, *Taylor* relied on *Delaware State College v. Ricks,* 449 U.S. 250, 256 (1980). In that case, the plaintiff professor was advised that his tenure application was denied, but he was nevertheless offered a "terminal contract" that permitted him to teach an additional year at the school. The professor waited until after his last day of teaching to file his EEOC charge alleging national origin discrimination, which was more than 180 days (the limitations period applicable to such Title VII claims) after he had been advised of the tenure decision. The Supreme Court rejected the professor's argument that the 180-day limitations period began to run on his last day of teaching, reasoning that the professor's termination came about because his terminal contract ended "upon its expiration," which was not an "independently discriminatory" event. *Id.* at 258. Indeed, the Supreme Court explained that for the professor to show that the limitations period began on his final day of teaching, "he should have identified the alleged discriminatory acts that continued until, or occurred at the time of, the actual termination of his employment." *Id.* at 257. While the mere expiration of a contract is not "independently discriminatory," a new decision to unlawfully deny a renewed request for an accommodation would be. *Tobin*, 553 F.3d at 130 ("[T]he denial of a disabled employee's request for accommodation starts the clock running on the day it occurs.... [S]uch a denial is a discrete discriminatory act[.]"). *Taylor* also relied on *Hall v. the Scotts Co.*, 211 Fed. Appx. 361 (6th Cir. Nov. 7, 2006). But that unpublished case relied on cases in which the employee had been terminated by his employer, failed to timely file an EEOC charge based on the date of termination, and then attempted to re-start the 300-day clock by writing to the employer

party opposing summary judgment is entitled to all *reasonable* inferences, *Ciminillo*, 434 F.3d at 464, nothing about the Kong DDL's mere reference to "full duty" reasonably implies that GM would only permit Guldi to return to work if he had no restrictions whatsoever.  In reality, the DDL's reference to "full duty" is a syllogism that cuts in GM's favor; because Guldi's own doctor indicated in his December 14, 2020 note that Guldi's restrictions were to *end* on March 16, 2021, as of that note's – and the Kong DDL's – issuance, the information before GM was that Guldi could return to work *without restrictions*, *i.e.*, "full duty," after that date.  (ECF No. 52-3, PageID.1510).  Viewing the Kong DDL's reference to "Full duty" in the context of the entire document makes the point even more clear.  Just like most all of Guldi's other DDLs, the "Note to Supervisor" in the Kong DDL states "NJAWR," i.e., no job was available with Guldi's Restrictions.  (ECF No. 51-4, PageID.1497).  The DDL also references Guldi's specific Restrictions and notes the date they are to "start" and the date they are to be "lifted."  (*Id.*).  Those dates line up exactly with the dates listed in Guldi's doctor's salient note of December 14, 2020, stating the Guldi's Restrictions were to last "from 12/14/2020 through 03/16/2021."  (ECF No. 52-3, PageID.1510).  In other words, the Kong DDL is the same as the others; it specifies the date Guldi's Restrictions begin and the date they end, and it is necessarily the case that an employee without restrictions is capable of performing his "full duty" work.

---

*post-termination* asking for the accommodation.  *Hall*, 211 Fed. Appx. at 362.  Again, those circumstances are readily distinguishable from a situation like Guldi's, where, throughout his long-term disability status with GM, and pursuant to GM's policies, he continued to submit quarterly accommodation requests which GM continued to consider.  (ECF No. 44-12, PageID.548) ("every three months the employee would have to go to medical to update their restrictions. . . . the plant medical would update restrictions every three months.").

Guldi's attempt to support his interpretation of the Kong DDL through other "evidence" fails. For example, in his revised Declaration, Guldi discusses the Kong DDL, asserting, "[f]or the first time in my nearly two years of being employed and review of Duty Disposition letters, the Note to Supervisor [in the Kong DDL] said 'Full duty.'" (ECF No. 59, PageID.1562). He goes on to assert, "'Full duty' here means I could *only* return to work without restrictions, i.e., 'Full duty.'" (*Id.*, PageID.1563) (emphasis in original). But this averment is simply Guldi's subjective interpretation of the verbiage, and he presents no evidence that would give him a proper foundation to speak on its meaning to GM. Thus, this specific "averment" by Guldi does not raise a material question of fact on the issue.

Next, Guldi avers that he spoke to his "union committee man, Shawn Lovelace," and asked him what the verbiage meant. (ECF No. 59, PageID.1563). Guldi avers that Lovelace responded that "he would look into it, which led to a meeting [Guldi] had with [Lovelace], Early Fuller, Jr. Chair and Trustee of UAW Local 160." (*Id.*). Guldi avers that "they explained their continuing with the grievance and affirmed what I already knew from the December 16, 2020 document, i.e., I couldn't go back to work at GM with restrictions." (*Id.*). Aside from the fact that Guldi's statement is unclear as to what Lovelace and/or Fuller actually said to him, Guldi presents no evidence that either one was authorized to speak on GM's behalf[7], and Guldi presents no evidence that any GM representative ever advised anyone that he could only return to work if he was restriction-free.

---

[7] While Guldi asserts that Lovelace and Fuller were "'deputized' by GM to pass along the information that Guldi would not be returned to work with restrictions," he presents no evidence to support that assertion. (ECF No. 57, PageID.1531). Indeed, the evidence in the record is to the contrary. (ECF No. 58-1, PageID.1556).

In short, Guldi staked his ADA claim on his assertion that "the application and enforcement of the 100% healed rule is the complained of discriminatory act," but the undisputed evidence is that there was no such "rule," and thus no such "discriminatory act." Accordingly, for all of the foregoing reasons, GM is entitled to summary judgment on Guldi's ADA claim.[8]

### *PWDCRA Claim*

For all of the reasons explained above, Guldi's PWDCRA claim also fails. Any alleged wrongdoing occurring more than three years before Guldi filed this lawsuit would

---

[8] Under the ADA, a plaintiff can assert a claim of "disability" if he is "regarded as having [] an impairment" that "substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(C). In his summary judgment response brief, Guldi accuses GM of "not address[ing]" his claim that GM's conduct gave rise to a "regarded as" claim under the ADA. (ECF No. 48, PageID.877). GM, in turn, argues that it didn't address such a claim in its summary judgment motion because Guldi "never identified or plead any facts indicating that he was relying on a 'regarded as' disability theory, and as such he cannot do so now in response to Defendant's Motion for Summary Judgment." (ECF No. 51, PageID.1485). In his sur-reply, Guldi asserts that he was not required to "raise his 'regarded as' discrimination stage" "at this stage." (ECF No. 57, PageID.1535). While it is true that a plaintiff "need not [] allege facts establishing a prima facie case of disability discrimination to survive a motion to dismiss under Rule 12(b)(6)," *Morgan v. St. Francis Hosp.*, No. 19-5162, 2019 WL 5432041, at *1 (6th Cir. Oct. 3, 2019), the Sixth Circuit has recognized that such a claim represents an "alternative way[]" by which the plaintiff can establish that he is disabled, and as such, is a claim that can be separately "plead." *Bryson v. Regis Corp.*, 498 F.3d 561, 575 (6th Cir. 2007). *See also Young v. INEOS ABS (USA) Corp.*, No. 1:17-CV-12, 2020 WL 1030879, at *13 (S.D. Ohio Mar. 3, 2020) (defendant granted summary judgment on plaintiff's ADA "regarded as" claim because he "did not allege a 'regarded as disabled' claim in his Complaint or at any time prior to responding to [defendant's] Motion for Summary Judgment," and the Sixth Circuit has made clear that "'when a plaintiff fails to assert a theory in [his] complaint, [he] may not raise it for the first time in response to the defendants' summary-judgment motion.'") (quoting *Golembiewski v. Logie*, 516 F. App'x 476, 478 (6th Cir. 2013)). However, even if Guldi adequately alleged such a claim in his complaint, it fails as it still turns on Guldi being able to show that he was "subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity," 42 U.S.C. § 12102(3)(A), and, for the reasons explained above, Guldi failed to raise a material question of fact on that issue.

be barred by the applicable statute of limitations.  And, again, in trying to circumvent the principle that "the continuing violation doctrine may not be invoked to allow recovery for acts occurring outside the filing period," Guldi asserted that "the application and enforcement of the 100% healed rule is the complained of discriminatory act which did not arise until December 2020."  (ECF No. 57, PageID.1534).  But, as explained above, Guldi presents no valid factual basis for any such claim, including under the PWDCRA.

Accordingly, GM is entitled to summary judgment on Guldi's PWDCRA claim.

## IV.   CONCLUSION

For the reasons set forth above, **IT IS RECOMMENDED** that GM's motion for summary judgment **(ECF No. 44)** be **GRANTED**.


Dated: September 6, 2024                              s/David R. Grand
Ann Arbor, Michigan                                   DAVID R. GRAND
                                                      United States Magistrate Judge


## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation, any party may serve and file specific written objections to the proposed findings and recommendations set forth above.  *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1).  Failure to timely file objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have.  *See Smith v.*

*Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also*

*Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  Copies of any objections

must be served upon the Magistrate Judge.  *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served

with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1).  Any such response should

be concise, and should address specifically, and in the same order raised, each issue

presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of
record and any unrepresented parties via the Court's ECF System to their respective email
or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on
September 6, 2024.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager